v. Merrick Garland, case number 1972024, and that each side has 10 minutes. So I have on here, so I'm assuming both sides are appearing by video here? Okay, so we see both of you here. Can you see us okay? Yes, Your Honor, from my part. Okay. Yes, I can see you as And can I panel here? All right. All right. So we'll go ahead and start with the Petitioner's Council. If you state your name and your appearance for the record, you have 10 minutes total. Good morning, Your Honor. Good morning, Your Honor. May it please the court. My name is Roger Green, attorney for Petitioner. I'd like to reserve one minute for rebuttal time. We are seeking petition for review of the board's July 15, 2019, denial. The board denial is largely nexus-based, as indicated. It recognizes the protected grounds of Guatemalan women and family-based grounds, but the decision focuses its denial on the middle paragraph of page two, and the denial's focus is on a crime aspect and disregards that certain populations are more likely to be victims of criminality. And in that case, in that denial, it bases it on matter of AB. Well, let me ask you this. What is your best evidence that the claimed threat by the woman outside the bank was motivated by membership in a proposed social group? And how do we determine whether the threat was motivated by economic gain or animus towards the family? Well, Your Honor, she, while she doesn't specifically state, you know, I'm robbing you because you're a woman, or because you have, because of that, for example, instead, a large part is circumstantial. In a sense, on page AR 146, when she approaches the petitioner, she says to her, she said that my family was here, and that I had a lot of money that I could give them. In that sense, when you look at... Well, that sounds pretty economic. Well, in terms of, there is a section also, in terms of circumstantial, if you look at the timing of the extortion death threats, it's made at a time when her husband has left the country. I'm going to alert the dishonorable court to AR 114, where she states before the immigration judge, that she didn't have any of these problems before her husband left. Instead, this problem occurred after he left the country. And moreover, in terms of circumstantial evidence, it wasn't as if she was approached as a believe that's important. She wasn't approached as this wasn't just a street special robbery attempt. Well, they didn't say, they didn't seem to know her name or anything like that. And her son was not with her at that time. Is that correct? You are correct, Your Honor. However, in terms of the timing of it, she did it when her husband was gone. The detail, the concern of concerning aspect is what appears to be some sort of stalking, plotting, and scoping out respondent schedule. Well, what evidence in the record would compel that result? Is there, was there any evidence of stalking? Well, in terms of just when she went to the bank, she confronted her when she was going to get her husband's money. Well, I know, but that the the IJ could have concluded that. But then on the other hand, why would, okay, Judge Van Dyke here, who's 6'6 and I'm 5'3, why would they, why would they pick me over Judge Van Dyke? You know, I mean, that doesn't necessarily mean that, you know, I mean, picking victims, you don't really want to pick the one that's going to give you the biggest fight, do you? I would agree, Your Honor. In that sense, that goes exactly in the parsim of Elias Zacharias. It goes as part of the heart of the motivation. Well, so what, what ties, I guess what you need to point me to some specific, because the IJ also found that they're just, I think there was a discussion of a murder of a cousin. And what, what are the nexus? What's the nexus evidence here? The nexus evidence, Your Honor, I believe Elias Zacharias notes that it doesn't have to be explicit. The perpetrator doesn't necessarily have to explicitly state the protected grounds. Instead, this court can use societal backdrop evidence. The country conditions as to see who is the most vulnerable segment of the population. And in many ways, the IJ decision, which the board adopts and affirms, is at some ways at war with itself. And its decision, the IJ's decision notes herself, notes that the record shows there's a high level of violence committed against Guatemalan women. And as part of the administrative record, page 75, the government's failing to enforce its laws against rape, domestic abuse. Did your client state anything about a political position that, that, did your client present any evidence at the hearing that this was motivated by politics or political positions? Was there any evidence to that effect? In that sense, it is manifest. No, a specific political position. Instead, it's the respondent's position that she's manifesting it in her lifestyle. We filed a 28-J with the court that discusses the recent, this court dishonorable court's position on the evolving nature of what can constitute a political opinion. In Rodriguez-Torne, it was stating a feminist position. In this situation, this petitioner, it's manifestation, it's manifesting her lifestyle. What does that mean? She avoids gangs? What is, how does she manifest it in her lifestyle? Thank you, Your Honor. She, she's, at the time, she's a single woman raising a little boy. She'd like to live peacefully. Her perpetrator, her persecutor tried to get money from her. She resisted. She took an active step. She wanted to maintain her integrity as a mother. She wanted to maintain her integrity as a woman. She believes that, you know, she's entitled. Counsel, let me, at the end of the day, doesn't your argument kind of reduce to anybody who, somebody comes up to rob them and they say, no, I don't want you to rob me? Then why, why does your argument not mean that every single person that would do that would express in the political position of opposition to being robbed? Thank you so much, Your Honor. In this sense, it's different in the sense that this involves Guatemalan women. It's not women from a different country. Sure, sure. But if it was a, let's say it was a man, you know, then it would be a man against men being robbed. I, I'm trying to figure out what it is that makes that, why, you know, your argument seems to prove too much. It basically says, we have cases that say being opposed to crime or being the victim of a crime is not enough to get asylum, just pure being victim of crime. But yours would seem to basically get around that by turning it into a political opinion. I'm just trying to figure out how that works. Again, Your Honor, the political, the protected ground of political opinion is an alternative basis. And in that sense, it's, it's, we would argue that it's manifest in her case by case situation. And if you look at her lifestyle, the peaceful life that she wished to have, and her resistance of the extortion threat. And again, it's in large part tied in. This is her attempt to go against the grain of what society, the societal conditions have noted. It's even noted by the immigration judge. The Guatemalan women have a tough road ahead of them. And the general sense is any specialized protection. And that's noted by the immigration judge. And the board adopts and affirms that decision. And Your Honor, I got one. So let me if do either my colleagues want to ask any questions now. Okay, you can reserve your the balance of your time. Thanks so much. Thank you. All right, we'll hear from the government. Good morning. Good morning, Your Honors. My name is Beau Stanton. I'm here today on behalf of the United States Attorney General. There are three overarching issues in this case. First, substantial evidence supports the agency's determination that the petitioner did not establish a nexus between the harm she experienced and the harm she fears and a protected ground. Petitioner testified in absolute terms that the female gang member targeted her for one reason, money. She repeated this on the stand. She repeated this in her asylum application, in her asylum statement. There is no doubt that this woman targeted her for money. Indeed, when the female gang member approached petitioner outside the bank, and petitioner refused to give her any money, petitioner explained the reason why she couldn't give her any money. It wasn't because of a political opinion. It was because she did not have the money to give her. Well, let me ask you, let me ask you about a Yala. Do you agree that a Yala allows for a finding of nexus when an individual is extorted based on their membership in a family group? Your Honor, I do not want to speak to that. I'm not. I'm not. Absolutely. You know, I want to make sure I understand that case fully. But I could write you a supplemental brief on this issue if you would like. No, that it would have been nice to have an answer here. But go ahead. Just on that point, you know, Mr. Green makes the point that, look, Doris, I'll call her. The petitioner was was targeted in the sense that would be robber knew she had a son because the threat was if you don't give me the money, I'm going to hurt your son. So doesn't that take this out of the category of just random criminal acts? Respectfully, Honor, it does not, because the whole motivation behind this woman targeting petitioner at all was because of the motive of money. If it were not for the motive of money, the female gang member never would have approached petitioner on the street. So right under her and her yes. So family can be a PSG. And then we also have cases that, you know, make sense that this pure economic motivations do not count for purposes of asylum, etcetera. What makes these kind of cases more challenging and why I'm particularly interested in this case is it seems pretty obvious to everybody. I think that the person that this this person was threatening the child as a means to getting the money. So I guess the question is, what do we do with that when when you're when you want to get money? So you grab a hold of a family member because you assume that the other person loves the family member and doesn't want them injured. And so you extort the money by that. Instead of saying I will blow up your car, you say I will blow up your family member, right? Like that's somehow I think if you said I would blow up your car, that would not be cars or not a PSG, I like if you say I blow up your family member, then does that sound? What do we do with that? I don't even know that we have really on point precedent for where it's obvious that you're using the family member because you think the person cares about them and just wants to extort to get the money that way. Well, ultimately, in this case, the female gang member was using the son as leverage to get the money from the petitioner. And within that context, ultimately, we have to go back to what was the woman's motive in threatening the son, right? It was all about getting the mom to comply with her demands to get that money. So ultimately, we have to go back to what is the ultimate motive of this woman in this case? So it wasn't just to be clear, is your is your position is the government's position that if, if sort of the family membership is sort of an robbery, then the family membership doesn't transform into being a PSG that the nexus would not be to the family membership that because of the underlying reason? Oh, I don't want to speak for the entire government. But I know in this case, though, that if you go back to the idea that the reason why the son was threatened at all was to get the money out of the mom, right? That's ultimately have to focus on like it's the fact that the son is related to the mother, it could have been something else, perhaps important. But it gets a little more complicated, because we have the son claiming asylum, too. So that he wasn't there. But does the claim threat to his mother also constitute a threat to her son based on the family relationship? Well, in this case, the son is a derivative of the mother's asylum application. And so by focusing on her, we have to determine whether or why she was targeted. And she wasn't targeted because of her membership on a particular social group. She wasn't targeted because of being a member of the Duras Zinga family. She was targeted because she had stepped out of a bank, the female gang member knew she had money. And ultimately, she had a son, knew she had a son. So when I asked petitioners counsel, how do we know they he said something about her? And they didn't indicate they know something about her. This is true. But there is no evidence of the record that they stalked her. There is no evidence that there was any interest in her after this. Indeed, petitioner testified that the female gang member never approached her again, after approaching her at that bank on that one day. So all we really have in this case, go ahead. I'm so sorry. I see what well, she went Doris went into hiding. And a few months later, she escaped, right. So it's not as if Oh, she lived in Guatemala for six months or a year after this. She was scared, obviously, by this would be robber and got out of the country pretty quickly. Yes, Your Honor. And she did go to the country very quickly. But that doesn't undermine the fact that she wasn't approached again, after refusing this gang member in terms of giving her money. I think you have points to your argument. But I think the I think it's a more nuanced situation than you're recognizing. And I think Ayala, if you had familiarity to that, would would tell you that, you know, the question is, I mean, if, if if someone is extorted based on their family membership, if which was the case, which comes out of Ayala, then if we find that there was no nexus to that here, that is one avenue to deny the petition. But that still doesn't mean that a person can't be extorted because of their family relationship. We were bound by Ayala. That's a thing for advocates. But it's a little more nuanced for us as a court that's bound by our precedent and what and what we haven't spoken to in terms of what we do in this case. And so on that, if there may be a need to publish in this case, do you do you see any need to publish in this case? I think it's a it's a pretty straightforward case in terms of determining whether or not what the motive was. Yeah, that's that's where I disagree with you on that. I mean, you keep thinking, well, crime was the ultimate nexus, and that's all we need to consider. But, you know, there's a ninth, another Ninth Circuit case called, it's hard to pronounce, Parissa Mova versus Mulcazy, which was a 2009 case. And that case points out that, look, for asylum purposes, you know, you've got to have at least one central reason to fear, you know, persecution. Well, and it says, look, there can be more than one central reason. And you can and I quote, and the petitioner or the asylum applicant need not prove which reason was dominant. So while you keep wanting to say, oh, there's only one nexus due to crime, well, but there could be two central reasons here. And the other being family relationship. Now, what do you say to that? Well, first, Your Honor, is that there is no evidence that the family particular social group was a central reason in this case. On top of that, citing the very case that you just used, and this is verbatim out of that decision, the nexus requirement is, excuse me, the motive to harm the applicant meets the nexus requirement if the persecutor would not have harmed the applicant if such motive did not exist. Right. So in this case, if you take up the motive of monetary value here, right, the cash, you take that off the table completely. Would this female gang member still have targeted petitioner? No. Petitioner herself repeated through testimony and her asylum application that it was money that the female gang member was after. That's where you run into that. That's where you run into the problem. Judge Callahan just talked about this Alaya case, which says that economic extortion as the basis doesn't mean you can't have a protected characteristic under the, you know, the statute. So, I mean, again, you don't want to go below the top level of the onion. And the question is, do we have to dig a little more deeply into that onion to find out if there's more than just one motive of just random robbery? Well, there's also there's also another thing here that the petitioner checked the box for political. And I don't see that. Where in the record is political addressed? If you go to the Board of Immigration Opinion, page two, they have a footnote where they address the political opinion claim. No, there's no evidence in the record. Indeed, if you go look at the record, look at the testimony, look at the application, look at the statements, there is no mention at all that petitioner presented a political opinion. Indeed, when she was approached by the female gang member, she didn't express an opinion. She simply said that I don't have the money to give you, which is why I'm refusing the idea. Is there anything in the record where the IJ addressed the political opinion claim? The IJ did not address that point directly. But ultimately, he found that there was no protected ground at all involved in this case, which would include political opinion. And then the board adopted a firm that decision and then dropped a footnote addressing that independently. I understand. But the board can't make its own fact findings if the IJ did. Do you agree with that? The IJ made the fact finding that there was no nexus to any protected grounds. Well, is that really sufficient to address? Because the IJ just said, hey, I don't find any relief from any protected ground, period. Would that cover the whole authority? Well, in addressing any protected ground, that would include the political opinion. And the fact is, there's no evidence, there's no compelling record evidence, which is the standard in this case, that the petitioner presented a political opinion that would have necessitated an entirely separate discussion. There's simply nothing in the record. Petitioner himself just admitted that she didn't state anything explicitly, right? There's no evidence cited in their brief that shows that a political opinion was ever expressed by the petitioner. You're over time, but let me make sure my colleagues... I want to clarify one thing. I didn't quite hear you were talking about a case and quoting from a case. I think it was a case that Judge Gilman had mentioned. What was the name of that case and what was it you were quoting? It is, I'm probably going to butcher it, but it's Paramoosa Mova. It's a 555 F3D and it's at page 740. And I was quoting that, and it was a part quote, but it is, the motive to harm the applicant needs to, excuse me, your honor, the motive to harm the applicant meets the nexus required if, and now I quote, the persecutor would not have harmed the applicant if such motive did not exist. And that quote finishes on 741. And so this helps support the government's case, because if you take money... I understand that. What year is that case, counsel? 2009. Good. Thank you, your honor, for filling that in for me. Thank you. All right. Thank you. No, that's all I needed. Thank you. All right. I'll give you two minutes for rebuttal. Thank you so much, your honor. If I can just, on rebuttal, the first thing I want to note is I believe that the court is entirely accurate in terms of viewing this case. I'll start with family. A nuanced approach may be the best approach in a sense. Well, thank you. We always like encouragement from the parties, but why don't you address Ayala? Thank you, your honor. In terms of the pecuniary aspect, it can be a motivation. However, there can be other reasons involved, and such is the case of the motivation of this persecutor to this petitioner. If it's money, they're going to go to the most vulnerable segment. They're going to go to the Guatemalan women. Second, and I think the court had its concerns with government counsel on this, when she threatens Nelson, her little boy, it takes it to another criterion. It takes it to another tier. The persecution takes another tier. Okay, so in this case, her son being part of the threat, but he wasn't there, and if it's a derivative petition, does he either fall or ascend based on her petition? Thank you so much, your honor. Actually, the record can reflect that he has his own separate asylum application that was filed before the immigration judge as well, his own separate application. So that's not before us? Your honor, we believe that the petitioners, they were included. They were included in that sense that petitions were included together. I think the IJ addressed Nelson's direct claim and again just found no nexus. It seems strange because obviously the would-be robber wouldn't have threatened him much for his relationship with Doris, his mother, right? Well, exactly, your honor. In this sense, we're arguing that it's not for anything that he has done, but it's for who he is related to, and this forms the LEA. This forms the Rios. The family is the quintessential social group, and it's for this relation that he's being targeted. Thank you so much, your honor. Unless the court has any other concerns or questions. I don't think we have other questions. Thank you for your argument. This matter will stand submitted.
judges: Gilman, CALLAHAN, VANDYKE